**Freddy Wayne CHOATE, Plaintiff,**

v.

**A.L. LOCKHART, Director, Arkansas Department of Correction, Dale Keith, Bob McCool and R.H. Smith, Defendants.**

**Civ. No. PB-C-89-174.**

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Nov. 22, 1991.

J.W. Green, Jr., Green & Henry, Stuttgart, Ark., for plaintiff.

Winston Bryant, Atty. Gen. by Steff Padilla, Asst. Atty. Gen., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

■ Currently pending before the Court are the proposed findings and recommendations of the Magistrate Judge recommending that plaintiff's case be dismissed.[1] Counsel for the plaintiff registered objections to the recommendations. Pursuant to the holding of the Court of Appeals for the Eighth Circuit in *Branch v. Martin*, 886 F.2d 1043 (8th Cir.1989), this Court must conduct a *de novo* review of the proposed findings and recommendations.

After carefully reviewing the proposed findings and recommendations, as well as the record in its entirety, this Court is persuaded that the evidence establishes that defendants, A.L. Lockhart, R.H. Smith, Delbert Keith and Billy W. McCool,[2] were deliberately indifferent to and demonstrated reckless disregard for plaintiff's safety when he was directed to perform work on a 45 degree angle plywood roof, without toe boards or scaffoldings installed, when plaintiff, among other things possessed a recognizable infirm right leg. Accordingly, this Court rejects the proposed findings and recommendations of the Magistrate Judge and rules in favor of the plaintiff on the question of liability as hereinafter discussed.

## RELEVANT FACTS

Plaintiff, Freddy Wayne Choate, was confined to the Arkansas Department of Correction [Department] on February 12, 1982, which was approximately the second or third time that plaintiff had been incarcerated at the Department. Plaintiff, among other skills, possesses extensive training and experience in the area of carpentry, and, as such, was assigned to the Department's construction crew sometime during 1983 or 1984. The construction crew makes repairs on buildings and on occasion constructs modest structures on premises of the Department. Plaintiff, when advised of his assignment to the construction crew, consulted with the physician at his unit, the Tucker Unit, and registered a complaint regarding the assignment and disclosed certain health problems he possessed that would render plaintiff unfit for the assignment. Plaintiff was immediately assigned a medical classification that specified that plaintiff should not be required to do any lifting, bending and squatting because of health reasons. Plaintiff was required to have an artificial knee implant on his right leg sometime during 1975. Plaintiff was reassigned "to

---

1. The issues in this proceeding were bifurcated by the Magistrate Judge on March 21, 1991, the date of the evidentiary hearing. In other words, the evidentiary hearing on March 21, 1991, was devoted exclusively to the question of liability. If plaintiff were successful in establishing liability, a second hearing would be conducted on the question of damages.

2. Defendants, Delbert Keith and Billy G. McCool, were the immediate supervisors of plaintiff's construction crew on the relevant dates involved in this proceeding. R.H. Smith was the overall supervisor of the construction project who visited the construction project periodically. A.L. Lockhart is Director of the Arkansas Department of Correction. The construction project involved a garage which was being constructed for the personal use of Mr. Lockhart. The evidence also reflects that Mr. Lockhart visited the site regularly.

The Arkansas Department of Correction was dismissed as a defendant on April 26, 1989.

The doctrine of *respondeat superior* is not at issue in this case since it has not been invoked or asserted.

light maintenance" work and was immediately transferred from the Tucker Unit to the Cummins Unit. However, in 1987, without any advance notice, plaintiff was "told to pack my things that I [plaintiff] was being transferred to the Pine Bluff Unit for construction [assignment]."

Sometime during the early part of 1987, plaintiff's construction unit was assigned the task of constructing "from the ground up", a garage on premises occupied by Director Lockhart, as a personal residence, but owned by the State of Arkansas and located at the Pine Bluff Diagnostic Unit of the Department.

On April 24, 1987, after the project had been operative for approximately five weeks, plaintiff and five other inmates were directed to perform "decking" on the roof of the structure which was approximately twelve feet above ground.

The area where the "decking" was to be performed was sloped at approximately a 45 degree angle; plaintiff and his associates, fellow inmates assigned to the crew, were required to make use of "a heavy-duty electrical saw" in cutting plywood in performing the decking and other related tasks and, as such, sawdust accumulated on the decking. On several occasions, plaintiff swept the sawdust off of the decking in an effort to reduce "hazardous and dangerous" circumstances.

Relative to the concerns regarding the hazardous conditions that they were exposed to registered by the inmates to their immediate supervisors, on the very morning of the day that plaintiff fell from the roof resulting in physical injuries, the following testimony was received during the evidentiary hearing:

Inmate Kevin Lamley testified as follows:

A. Mr. Keith come in and asked what was wrong. That's when all this other stuff come up.

Q. What other stuff?

A. About the roof being slick.

Q. Who brought that up?

A. I did.

Q. What did you say?

A. I told him that the roof's too slick to work on.

Q. And what did he say?

A. He said, 'Shut up and go back to work.'

. . . . .

Q. And you asked that something be placed there to keep you from sliding off?

A. I said, 'Something needs to be put on the bottom in case somebody does slide.'

Inmate Ronald Bartlett testified as follows:

Q. Okay. After this accident [plaintiff's fall from the roof], did you all have to wear safety harnesses when you were up there?

A. Oh well, after the accident occurred, Mr. Smith, along with the Warden, and a few other people came over, and we had to put up some sort of safety boards to prevent people from sliding off the roof, plus we also had to use scaffolding and walk boards.

Q. Okay. But you didn't have to wear any type of harness or anything like—

A. Well, they—they came out with—it was before the fact that we had to wear safety helmets or sign a waiver refusing to wear them, or being responsible for ourselves if we refused to wear them.

Plaintiff Choate testified as follows:

Q. Okay. And you started sliding from the roof?

A. Yes, sir.

Q. And were you able to stop yourself?

A. No, sir.

Q. Was there any toe board there for you to strike on or to put your feet against or hands against—

A. No.

Q. —to stop yourself?

A. No, sir.

Q. Okay. Now this particular roof that you were working on, was it a flat roof or was it an uneven roof or—

A. About a 45-degree angle.

.    .    .    .    .

Q. And, in taking the break, did you get down off the building to take the break?

A. No, sir.

Q. Mr. Choate—Mr. Choate, excuse me, the knee, the right knee, how did it affect you, as far as—or did it affect you, at all, as far as walking on that building—uneven building?

A. Yes, sir, it did.

Q. What did it do?

A. Well, I can't bend it all the way, and it just—it just give me a lot of trouble. It hurt all the time, and just—

Q. As far as raising your body up and down from a squatting position or to get up and down in doing work there on that particular building, strength-wise, what kind of strength did it have?

A. It was very weak. My whole leg is very weak.

Q. As far as balance, did it affect it in any way, whatsoever?

A. Yes, it did.

Q. How did it affect it in balance?

A. Well, it—*I limped a lot on it,* and it just—I couldn't—sometimes it will lock up on me. I'd be on a—like on unlevel ground or unlevel surface, it would try to lock up on me. And I complained so much, I finally—but when they sent me back again, I just got tired of complaining. I said, 'Well, I'll just have to deal with it,' and then—so I just—you know, that's the reason I quit complaining after I got back—after they put me back on construction the last time. (Emphasis added)

.    .    .    .    .

A. Well, we was right—I was right at the end, west end of the south side, sitting on the middle part of the roof there. It was—there were actually too many of us. *They had too many of us up there to complete—* to complete the job, because—so I just stepped back and was sweeping the dust off, and I was actually working on—I was working from the southwest corner and the west end there. (Emphasis added)

On cross-examination, plaintiff testified as follows:

Q. Okay. All right. You also talked about your medical classification and the fact that you do have a knee problem and you indicated that when you were originally taken off construction and went to Cummins, I believe, and when you were dragged back to construction at a later date, during this period of time you testified, I believe, that you complained about the knee until you got tired of it?

A. Got tired of complaining.

Q. Okay. Never felt like it was doing any good?

A. Now I'd go back and forth to the doctor, but he wouldn't take me off construction this last time.

Q. All right. You started on this particular job when? How many weeks before you were injured?

A. I recall I think five weeks.

Q. About five weeks. During that five-week period of time, did you ever go to Mr. Keith or Mr. McCool and say, because of your knee, you were unable to do any of the jobs that you were assigned to?

A. No, sir.

Q. Okay. Did you ever report to sick call during that period of time?

A. I can't specify the dates or—dates, but I do recall going to sick call.

Q. All right. No one prohibited you from doing that? I mean no one stopped you from going to sick call, right?

A. No, sir.

Q. Okay. And were you, in any way, punished by Keith or McCool for going to sick call?

A. No, sir.

Q. All right. So, whether you got a medical lay-in or not, that just meant you weren't on the job, as far as Mr. Keith or Mr. McCool were concerned?

A. If I had a medical lay-in—

Q. Un-huh.

A. —I wasn't on the job, no.

Q. Okay. And they never tried to force you to work out there if you had a medical lay-in or a sick call, did you—or did they?

A. Well, they—if you just laid-in too much they would complain and—or say something, 'What's wrong?' you know, and they couldn't—they wouldn't—if a inmate lays—

Q. Now I'm just talking about you now, Mr. Choate. I'm talking about you during this five-week period. You said you don't even recall if you did, but you may have had one lay-in. Now—

A. I don't recall how many I had. I had one or two or three.

Q. Okay. And, after those, did you see any change in Mr. Keith or Mr. McCool's treatment toward you when you came out there?

A. Oh, Mr. Keith would complain or something, like 'How come'—me ·might ask something like, 'Why do you—how come you can't be at work?' or something like that, but nothing that—I guess it was aggravating to him if I missed a lot of work.

Plaintiff testified further that Supervisor Keith left the construction site in order to obtain needed materials for the roofing job. During this period, the inmates on the roof were given a break by Supervisor McCool. Plaintiff testified further as follows on redirect:

Q. All right. When you were told to take a break, were you permitted to smoke while sitting on the roof?

A. Yes, sir.

Q. And were you told to get down by either of these supervisors, if, in fact, you were going to smoke?

A. No, sir.

Q. Did either one of them make any objection to you smoking, sitting there on the roof?

A. No, sir.

Q. All right. Now Internal Affairs or Medical Services taking a report from you, did either one of them ask you did the sawdust contribute to your fall?

A. No, sir, they didn't.

Q. Okay. Internal Affairs or Medical taking a report from you, did either one of them ask you if you had asked for your cigarettes to be sent up?

A. No, sir, they didn't ask me.

Q. Okay. Now going back over the accident itself, just describe for the Court exactly how the cigarettes plays into the end result of you falling.

A. The inmate threw—threw them up to me, and I just reached over and picked them up and sat down.

Q. Were you sitting then or in the process of sitting, or what?

A. I had sat down.

Q. Okay. Now, when you sat down, what happened then?

A. I started sliding.

Q. And what did you slide on, other than the bottom of your person? What was on the surface that you were sliding on?

A. Sawdust.

Q. All right. Now did the cigarettes cause to slide?

A. No, sir.

Q. Did the cigarettes contribute to your sliding?

A. No, sir.

David Stocks, a building inspector and code enforcement officer for the City of Stuttgart, who has served as superintendent of a construction company from 1954 to 1971, testified as follows as plaintiff's expert witness:

Q. What is the generally-accepted practice for decking? How does one go about it? Do you cut it on the roof? Do you cut it on the ground?

A. It's supposed to be cut on the ground.

Q. Okay. Why?

A. Back, again, to safety purposes, most of the time, when you're decking a roof, you don't know how much wind there is so you have someone handing up the decking, either the one or two men to put it in place, tack it down, and then usually you have one or two people nailing behind.

Q. What about the fitting of it, though, and the marking on it and sawing, where is that—

A. Well, that should be done on the ground, because you never know how much wind you have, and you have a safety factor when someone picks up a piece of decking and go up, so you try to make sure two men handle the decking as it goes up.

Q. What about sawdust? Does that present a problem?

A. Certainly. Yes.

Q. How does the sawdust—

A. Well—

Q. —present a problem on the decking, if the sawing is being done on the roof?

A. Whether it is AC plywood, CD plywood, your exterior grade—of course, your C grade marks your construction has, exterior grade plywood, it gets very slick. The workers need to have crepe sole-type shoes or rubber-sole shoes, no leather, at all, on a roof, even with no sawdust. And, of course, for their protection, you use toe boards.[3]

Q. What is a toe board?

A. Any type of material, not less than a 2 × 4, in my estimation, nailed close to the edge of the roof, and according to how steep the roof to how

many toe boards you use going up, because you should use more than just one.

In response to the question regarding the purpose of a toe board, Stocks testified:

A. To—the main purpose, to keep someone, if they slide, from falling off, plus any material or hammers or this, that and the other that comes down, and hopefully, that the toe board will catch—

Q. Well, lets say that—

A. —and not injure someone that's on the ground.

Q. Let's say that I'm coming off sliding head first. How is a toe board going to help me?

A. Well, you can stop it with your hand.

Q. Let's say that I am sitting on my bottom and come sliding off. How is a toe board—

A. You try to catch it with your heel.

Q. Okay. And if the toe board is there and the toe board works like it should, what is it supposed to do?

A. Stop you.

Q. Stop you from what?

A. Falling and—

Q. Falling off of what?

A. Off of the roof.

## DISCUSSION

Plaintiff contends that the conditions of his status as an inmate resulting in physical injury to his lower extremities as well as pain and discomfort, constituted "cruel and unusual punishment inflicted" which is proscribed under the Eighth and Fourteenth Amendments to the Federal Constitution.

The Supreme Court in *Wilson v. Seiter*, —— U.S. ——, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991), in vacating an order granting officials' motion for summary judgment in a prisoner's action claiming that conditions of confinement constituted cruel and unusual punishment stated:

---

**3.** The evidence reflects that the decking was cut on the roof as opposed to the ground. Plaintiff wore leather sole shoes as opposed to rubber or crepe sole.

The 'deliberate indifference' standard applied in *Estelle v. Gamble*, 429 U.S. 97 [97 S.Ct. 285, 50 L.Ed.2d 251] ... to claims involving medical care applies generally to prisoner challenges to conditions of confinement.

■ Deliberate indifference can be inferred from evidence when a risk is sufficiently obvious to warn officials of the need for protective measures and the officials fail to take measures to avoid harm to the complaining inmate. *See, Murphy v. United States*, 653 F.2d 637, 644–45 (D.C.Cir. 1981).

■ In the case of *Johnson v. Clinton*, 763 F.2d 326, 328 (8th Cir.1985), the court observed on finding that inmate Johnson had alleged sufficient facts to state a claim under Title 42 U.S.C. § 1983:

> There are circumstances in which prison work requirements constitute cruel and unusual punishment. {citation omitted}. '[F]or prison officials knowingly to compel convicts to perform physical labor ... which constitutes a danger to their ... health, or which is unduly painful constitutes an infliction of cruel and unusual punishment prohibited by the Eighth Amendment....' {citation omitted}. Further, 'deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment'. Citing *Estelle v. Gamble*, 429 U.S. 97 [97 S.Ct. 285, 50 L.Ed.2d 251] (1976).

In *Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir.1977), the court in finding that inmate Ray had stated a claim and that his complaint should not have been dismissed stated:

> "[F]or prison officials knowingly to compel convicts to perform physical labor which is beyond their strength, or which constitutes a danger to their lives or health, or which is unduly painful constitutes an infliction of cruel and unusual punishment prohibited by the Eighth Amendment to the Constitution of the United States as included in the 14th Amendment."

The evidence in this proceeding reflects, without any doubt whatsoever, that due to health reasons, plaintiff was precluded from engaging in any work activities requiring lifting, bending and squatting because of an artificial knee implant on plaintiff's right leg, as well as other problems associated with his leg condition, i.e., physical weakness and poor balance or a condition of unsteadiness. In addition, plaintiff's physical impairment caused intense pain and discomfort as well as a limp whenever plaintiff moved about on foot. Plaintiff's condition was readily plain and obvious to individuals in his immediate presence. Indeed, plaintiff's condition was known or should have been known to his supervisors who had been in plaintiff's presence for approximately five weeks in the construction of the garage. The evidence further reflects that Director Lockhart visited the construction site regularly and observed the construction crew in action.

Significantly, associates of plaintiff, who possessed no physical impairments, were reluctant to perform work on the roof in question because of the lack of safety measures employed to prevent or minimize the obvious risks and hazards that they were compelled to face even after registering their concerns to their supervisors. The response to the concerns expressed was *"[s]hut up and go back to work"*.

Plaintiff not only expressed his concerns about his welfare to the physician of the unit, but to his supervisors as well and because of their failure to express any interest or concern, plaintiff elected to avoid sick call and bear the pain and misery he was experiencing in order not to irritate his supervisors, and avoid a disciplinary action or any penalties imposed against him. Plaintiff testified that on occasions when he went to sick call or expressed concern about his condition, his supervisors would be "aggravat[ed]" if plaintiff missed work.

The evidence also reflects that the supervisors in requiring five to six inmates to work on the roof in question above created potential hazards due to overcrowding

without even considering the fact that the inmates were required to make use of an electric saw twelve feet above ground when the practice is to cut the materials at ground level and avoid increased risks by adding sawdust to a slick surface with a 45 degree angle; inmates wearing leather sole shoes as opposed to rubber or crepe sole; and the failure, although reminded, to establish toe boards, scaffolding, walk boards or require the inmates to wear safety harnesses. This indeed illustrates further the conscious and deliberate indifference that the supervisors expressed regarding the welfare of the inmates under their direct supervision.

The fact that plaintiff fell from the roof during a "break" and not when he was actually engaged in carpentry work does not, in the judgment of this Court, mitigate in favor of defendants warranting or justifying a ruling against plaintiff on the issue of liability. Surely, it was foreseeable that there would be a need or an attempt of the inmates on the roof to communicate with fellow inmates stationed on the ground or that the inmates on the roof would have to descend to the ground to make use of bathroom facilities and not remain stationary in one spot during the course of a day's activity. Most importantly, it is clear that following the incident, resulting in the injuries of the plaintiff, the supervisors immediately took corrective measures to minimize the hazards confronting the inmates by establishing toe boards and scaffolding in the work area.

A plaintiff is not required to demonstrate or show a culpable state of mind on the part of defendants, but only "deliberate indifference" in order to establish his claim. The Court finds that plaintiff has, indeed, met his burden of proof and should prevail on the issue of liability.

IT IS SO ORDERED.